ams

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 09-40084-01-JAR |
| ) | |
| DAMON HUNTER, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## MEMORANDUM AND ORDER

This matter comes before the Court on defendant Damon Hunter's Motion to Suppress (Doc. 26). The Court conducted an evidentiary hearing on February 16, 2010 and permitted the parties' to submit supplemental briefing. The matter went under advisement when the government filed its post-trial response brief on March 31, 2010. The Court has considered the parties' submissions and the evidence adduced at the hearing and is prepared to rule. As described more fully below, defendant's motion to suppress is denied.

**I.      Factual Background**

On August 28, 2009, Trooper Chris Nicholas of the Kansas Highway Patrol was patrolling Interstate-70 in Wabaunsee County, Kansas. He was on special assignment that day for the "TOPS" program, in which troopers watch for safety issues through a semi-tractor trailer ("semi") that is equipped with cameras. Other troopers watch for violations by either following the semi or patrolling regular traffic.

At 7:15 a.m., Trooper Nicholas was traveling eastbound in the passing lane in his squad car when he observed a Dodge crossover vehicle following a different semi in the driving lane.

Driving conditions were normal. Trooper Nicholas testified that the Dodge vehicle was following approximately one second behind the semi. Trooper Nicholas believed that the Dodge was following too closely behind the semi because two seconds is considered a safe following distance. He testified, however, that he does not believe he actually counted it out at the time of the stop. After observing the Dodge for ten to fifteen seconds, Trooper Nicholas decided to perfect a traffic stop.

After the Dodge correctly pulled over, Trooper Nicholas turned off his squad car lights and approached the vehicle on the passenger side for safety reasons; he explained to the occupants of the vehicle that he pulled them over for following too closely. Trooper Nicholas obtained the driver's license for the driver of the Dodge, as well as rental papers. The driver and passenger told Trooper Nicholas that the rental contract appeared to have expired two days before, but that they extended it. Noticing the name on the rental papers, Trooper Nicholas asked "Damon" to identify himself and produce identification. Defendant Hunter, sitting in the passenger seat, produced a Minnesota driver's license. Trooper Nicholas observed that the driver, defendant Alice Isaacson, appeared tired. He told both occupants that he was going to go back to his patrol car and write a ticket.

While at his patrol car, Trooper Nicholas ran a criminal background check of both driver's licenses. While he was still waiting on the results of the backgrounds checks, Trooper Nicholas asked Isaacson to come back to his patrol car. He noticed that Isaacson's Minnesota driver's license listed a Kansas City address and wanted to know why. Based on his training and experience, this can sometimes indicate criminal activity. He asked Isaacson about the nature of the trip and the rental car contract. Isaacson said that she and Hunter were friends and that they

2

were coming from a wedding near Colorado Springs; they were friends with both the bride and groom. Isaacson said the rental contract had been extended. Trooper Nicholas noted that Isaacson mainly looked straight ahead while talking with him. He told Isaacson to return to the Dodge and tell Hunter to come back to the patrol car because he wanted to talk to him about the rental papers, "just to make sure."

The rental agreement said that the vehicle was due on August 26 by 5:00 p.m. in Minnesota. Trooper Nicholas asked Hunter about the rental contract and whether he had extended it. Hunter said it was supposed to be returned "on Wednesday" and that he was supposed to extend it but had not. Hunter told Trooper Nicholas that they had been at a wedding in Colorado Springs, and that they were friends with both the bride and the groom. When Trooper Nicholas asked Hunter about the wedding, Hunter said that Isaacson had been pressing him to get married, but then stated that they had been friends forever.

After waiting for several minutes for the background check results, Trooper Nicholas decided not to wait and re-approached the passenger side of the Dodge. He intended to return their documentation and end the traffic stop. Trooper Nicholas explained the two-second rule again to the occupants and explained how to count to two seconds properly for following distance; he stated that it can also be measured as "two or three car lengths." He explained that it was easy "out here" to measure distance between vehicles, compared to in town. He explained that the semi could not see the Dodge traveling behind it at the distance it had been following. Trooper Nicholas told the occupants to have a safe trip, and said "thank you." He did not lean on the car.

After taking a few steps away from the Dodge, Trooper Nicholas turned back and asked

3

if he could ask them a few more questions. Hunter said "yes." Trooper Nicholas asked Hunter if he was going to take care of the rental contract. Hunter said he would, and explained that he did not have money in his account when they rented it. Trooper Nicholas then asked if they had anything illegal in the vehicle. Hunter replied, "no." Trooper Nicholas asked if he could search the vehicle; Isaacson and Hunter looked at each other but did not respond. Trooper Nicholas told them that he needed a "yes" or "no." Hunter stated that he did not see the reason for the search. Trooper Nicholas repeated that he needed a "yes" or "no." Again, Isaacson and Hunter looked at each other and did not respond. Trooper Nicholas told them that he did not intend to "tear up anything," and that they should just give him the keys if it was alright to search. Isaacson took the keys out of the ignition and handed them to Trooper Nicholas. Hunter did nothing to stop her.[1]

Trooper Nicholas checked the back of the vehicle first, under the spare tire and then eventually went to the driver's side rear door. When he opened that door, a book fell out and he asked if they were taking classes. He noticed a suitcase in the back seat and smelled an odor of marijuana when he stuck his head in the car. Trooper Nicholas asked if the occupants were sure that there was nothing illegal in the car, because it "kinda smells like weed." He did not inquire who owned the suitcase. Trooper Nicholas opened the suitcase and found a clear wrapped bundle. Trooper Nicholas ordered both Isaacson and Hunter out of the vehicle and placed them under arrest.

When the car was impounded and searched, police found thirty-five pounds of marijuana,

---

[1] At some point after Isaacson gave Trooper Nicholas the keys to the vehicle, the background checks were completed. Trooper Nicholas learned that both had criminal history: one defendant had a history involving drugs, and the other involved possession of a weapon.

one kilogram of cocaine, and a weapon in the console. Neither of the defendants admitted that they owned the weapon found in the vehicle.

**II.     Discussion**

Defendant argues that suppression is warranted on the following grounds: (1) K.S.A. § 8-1523(a) is unconstitutionally vague; (2) Trooper Nicholas lacked reasonable suspicion for the initial stop and it was pretextual; (3) the detention was unreasonably prolonged; (4) there was no valid consent to search the vehicle; (5) the scope of consent did not extend to the suitcase. "'A traffic stop is a "seizure" within the meaning of the Fourth Amendment, even though the purpose of the stop is limited and the resulting detention quite brief.'"[2] The principles of *Terry v. Ohio*[3] apply to such traffic stops. Thus, the reasonableness of a stop depends on "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place."[4]

*A.     The Initial Stop*

Tenth Circuit cases establish that "a detaining officer must have an objectively reasonable articulable suspicion that a traffic violation has occurred or is occurring before stopping [an] automobile."[5] Reasonable suspicion may be supported by an "objectively reasonable" good faith belief even if premised on factual error.[6] Trooper Nicholas stopped the

---

[2]*United States v. Holt*, 264 F.3d 1215, 1220 (10th Cir. 2001) (en banc) (quoting *United States v. Hunnicutt*, 135 F.3d 1345, 1348 (10th Cir. 1998) (further quotation omitted)).

[3]392 U.S. 1 (1968).

[4]*Id.* at 19–20.

[5]*United States v. Cervine*, 347 F.3d 865, 869 (10th Cir. 2003); *United States v. Soto*, 988 F.2d 1548, 1554 (10th Cir. 1993).

[6]*United States v. Vercher*, 358 F.3d 1257, 1261 (10th Cir. 2004).

Dodge vehicle because he believed it was following too closely behind a semi, in violation of K.S.A. § 8-1523(a).

### 1. Constitutionality of K.S.A. § 8-1523(a)

K.S.A. § 8-1523(a) provides: "The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway." Defendant argues that the statute is unconstitutionally vague because there is no definite way to measure distance between vehicles and the determination of following too closely is left to the subjective criteria of each officer.

"A statute is impermissibly vague if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits."[7] A statute can also be impermissibly vague if it authorizes or encourages arbitrary and discriminatory enforcement.[8] "Vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand."[9]

The Court is unable to find that K.S.A. § 8-1523(a) is void for vagueness. As the government argues, the two-second rule used by Officer Nicholas is a widely accepted test for determining whether a vehicle is following too closely. The government attaches the Kansas Driver's Handbook to its response, stating the two-second following distance rule.[10] While the

---

[7]*United States v. Franklin-El*, 554 F.3d 903, 909 (10th Cir. 2009) (quotations omitted).

[8]*Id.*

[9]*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 n.7 (1982) (quotations omitted).

[10](Doc. 39, Attach. 1.)

handbook is not, of course, part of the statute, it is strong evidence that people of ordinary intelligence would understand that following less than two second behind a vehicle is prohibited by the statute. Both the Kansas Supreme Court and the Tenth Circuit have approved of the "two-second rule of thumb" to determine whether a vehicle is following too closely under this statute.[11] Likewise, a multitude of courts considering almost identical statutes, have found this standard not to be impermissibly vague.[12] Here, defendant does not dispute that the Dodge vehicle was traveling approximately one second behind the semi while traveling on an interstate outside of town at a high rate of speed.[13] Regardless of whether the statute could be vague under certain circumstances, the Court finds people of ordinary intelligence would understand that one second or less does not constitute a reasonable and prudent traveling distance.

Additionally, even if the Court found that the statute is impermissibly vague, the good faith exception would apply. Under the good faith exception, "evidence should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment."[14] The Supreme Court recently explained that in order for the exclusionary rule to apply, "police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently

---

[11]*United States v. Nichols*, 374 F.3d 959, 965 (10th Cir. 2004), *cert. granted and vacated on other grounds*, 543 U.S. 1113 (2005); *Kansas v. Moore*, 154 P.3d 1, 7 (Kan. 2007).

[12]*See, e.g.*, *United States v. Mendez-Cejas,* No. 2:08-cr-00024-JCM-GWF, 2009 WL 914873, at *4 (D. Nev. Jan. 15, 2009)*, aff'd,,* 2009 WL 961464 (D. Nev. Apr. 2, 2009); *United States v. Johnson,* No. 5:04CR65-1-V, 2006 WL 435975, at *4 (W.D.N.C. Feb. 21, 2006)*, aff'd,* 258 F. App'x 510 (4th Cir. 2007); *Tennessee v. Harton*, 108 S.W.3d 253, 258 -260 (Tenn. Crim. App. 2002) (the "statute, provides fair warning of prohibitive conduct and provides sufficient guidance to prevent arbitrary and discriminatory enforcement.").

[13]In fact, Hunter can be heard on the DVD joking with Trooper Nicholas about how close Isaacson was following the semi.

[14]*Herring v. United States*, 129 S. Ct. 695, 701 (2009) (quotations omitted).

culpable that such deterrence is worth the price paid by the justice system."[15] Here, the Kansas statute that proscribes following too closely was presumptively valid at the time of the stop and multiple courts had explicitly approved of the use of the two car lengths rule and the two-second rule to measure distance under the statute. Under these circumstances, the good faith exception to the exclusionary rule would apply.[16]

### 2. Reasonable Suspicion of Traffic Violation

Next, defendant argues that Trooper Nicholas did not have a reasonable suspicion of a traffic violation sufficient to justify the stop and that the stop was pretextual. Defendant relies heavily on the Tenth Circuit's decision in *United States v. Vercher*,[17] where the Court expounded upon the reasonable suspicion required to justify an initial stop pursuant to K.S.A. § 8-1523(a). As an initial matter, the Court disposes of defendant's objection that the stop was improper because it was pretextual. Under *Wren v. United States*,[18] selective enforcement of a law may amount to an equal protection violation, but it has no bearing on whether a traffic stop is reasonable under the Fourth Amendment.[19] Even if the traffic stop was pretextual, so long as Trooper Nicholas had a reasonable suspicion of a violation of K.S.A. § 8-1523(a), the stop is justified.[20] Whether the "officer may have had other subjective motives for stopping the vehicle"

---

[15]*Id*. at 702.

[16]*Accord United States v. Gregory*, 302 F.3d 805, 808–09 (8th Cir. 2002).

[17]358 F.3d 1257 (10th Cir. 2004).

[18]517 U.S. 806 (1996).

[19]*Id.* at 813.

[20]*See United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995) (en banc).

8

is irrelevant.[21]

Therefore, the Court proceeds to discuss the pertinent inquiry, whether Trooper Nicholas had reasonable suspicion of a violation of K.S.A. § 8-1523(a). In *Vercher*, the Tenth Circuit explained that reasonable suspicion that a traffic violation occurred requires "some minimal level of objective justification," but the officer "need not rule out the possibility of innocent conduct so long as the totality of circumstances suffices to form a particularized and objective basis for the traffic stop."[22] The officer may rely on information that is less reliable than what is required to show probable cause and "it need not be correct."[23]

> Of the factors listed by the statute—speed, following distance, road conditions, and traffic conditions—the only factor found by the district court not to have been taken into account by Rios was the particular traffic conditions surrounding the stop. However, as the videotape reveals, general traffic conditions—i.e., relatively few vehicles driving on the road—were patently apparent. K.S.A. § 8-1523(a) establishes that the danger of following too closely is manifested by the distance between vehicles, with due regard for the speed, road, and traffic conditions. On a rural interstate in Kansas, an officer's observation of the high speed and dangerously close traveling distance provides sufficient objective justification to suspect that the distance between the vehicles is not "reasonable and prudent." Although Terrell's added explanation of the particular traffic conditions may establish that a traffic violation had not in fact occurred under Kansas state law, that does not trump the relevant standard before us; Rios's observations need only articulate a basis for a suspicion that a traffic violation might have been occurring.
> . . . .
>
> In the instant case, therefore, we agree with the government that

---

[21] *Id. Botero-Ospina* explicitly rejected the standard enunciated in *Guzman*, relied upon by defendant in his brief. *Id.* at 787.

[22] 358 F.3d at 1261 (quotations omitted).

[23] *Id.*

> Rios's observation of the high speed and close distance in this case provide a sufficient basis to suspect that Terrell was following more closely than was reasonable and prudent under the circumstances. Thus we conclude that in some cases, an officer's observation of a vehicle traveling at a high speed and close distance from the preceding vehicle, while not necessarily sufficient to convict, is sufficient to provide a reasonable suspicion to effectuate a traffic stop. That the facts may not support a conclusion that Terrell actually violated the law is irrelevant; reasonable suspicion requires "a showing considerably less than preponderance of the evidence," and may be justified on a quantum of evidence far less than that required to establish probable cause—a fortiori, far less than to establish guilt.[24]

Defendant reads the quoted passage as imposing a two-factor test for determining whether a violation of § 8-1523(a) occurred: a vehicle traveling at a high rate of speed and close distance to the preceding vehicle. He distinguishes *Vercher*, by arguing that the officer's observation of both high speed and close distance justified the stop in that case, whereas Trooper Nicholas initiated the stop here based only on his subjective determination of the distance between the Dodge and the semi preceding it. Because Trooper Nicholas did not state that the Dodge's rate of speed contributed to his decision to effect a traffic stop, defendant argues that there was no reasonable suspicion to believe a violation of K.S.A. § 8-1523 occurred.

The Court begins by noting that defendant misstates the Tenth Circuit's decision in *Vercher*. The court explicitly limited its holding in that case to the circumstances of the case, stating that "in some cases" the officer's observation of high speed and close distance will be sufficient to provide reasonable suspicion. The court did not announce a new two-factor test for an initial stop to be justified pursuant to this statute, but instead determined that the officer under

---

[24] *Id.* at 1262–63 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 126 (2000)).

those circumstances had developed reasonable suspicion.[25]

More importantly, the Court finds that Trooper Nicholas articulated a reasonable suspicion that the Dodge was following too closely, in violation of K.S.A. § 8-1523. First, the Court finds Trooper Nicholas' testimony credible that two seconds is considered a safe following distance. He testified that this is the distance required to have sufficient reaction time in the event the preceding vehicle breaks suddenly. Trooper Nicholas' belief that the two-second rule is a proper measure of a safe following distance has been previously found to provide a "minimal level of objective justification required for reasonable suspicion justifying a traffic stop."[26] Moreover, Trooper Nicholas explained to the defendants when he gave the warning that a safe following distance is two seconds, and explained in detail how to properly count out following distance under this rule. He explained that it was especially important in this case because the Dodge was traveling behind a semi and suggested that, at a one-second following distance, the semi driver may not be able to see them in his mirrors. Trooper Nicholas further explained that it can also be measured as "two or three car lengths." He explained that it was easy "out here" to measure distance between vehicles, compared to in town.

The Court finds that Trooper Nicholas' testimony, in conjunction with his warning to the defendants as heard on the DVD, supports his reasonable suspicion that the vehicle was following too closely. The statute proscribes following too closely, " having due regard for the

---

[25]The court framed the "narrow question" before it as "whether, given the district court's finding that Rios did not observe whether the vehicles surrounding Terrell's minivan were decelerating, Rios's observations of the speed and distance alone may support an objectively reasonable suspicion . . . ." *Id.*

[26]*United States v. Nichols*, 374 F.3d 959, 965 (10th Cir. 2004) (internal quotation omitted), *cert. granted and vacated on other grounds*, 543 U.S. 1113 (2005); *Kansas v. Moore*, 154 P.3d 1, 7 (Kan. 2007); *see also United States v. Worthon*, 520 F.3d 1173, 1176–77, 1179 (10th Cir. 2008) (affirming district court finding of probable cause to stop for violation of K.S.A. § 8-1523(a) where trooper testified that a safe following distance was two seconds and the defendant's following distance was under a half-second).

speed of such vehicles and the traffic upon and the condition of the highway." Trooper Nicholas testified that he observed the Dodge for ten to fifteen seconds before deciding to stop the vehicle. He testified that highway conditions were normal, and noted the distances based on a two-second count estimate. Trooper Nicholas also noted the fact that the stop occurred outside of city limits, where it is much easier to maintain a safe, two-second following distance. The Court agrees with the government that the two-second calculation necessarily takes into account the speed of the vehicles. Trooper Nicholas' observation of road conditions, the speed and distance of the vehicles pursuant to the two-second rule, as well as the fact that the Dodge was following a large semi, created the minimal level of objective justification required to justify the initial stop.

### B. *Length of the Detention*

Even if the initial stop of defendant's vehicle was legitimate, the detention must be "reasonably related in scope to the circumstances which justified the interference in the first place," as required under *Terry*.[27] "Generally, an investigative detention must last no longer than is necessary to effectuate the purpose of the stop."[28] However, "an officer conducting a traffic stop may request vehicle registration and a driver's license, run a computer check, ask about travel plans and vehicle ownership, and issue a citation."[29] Upon issuing a citation or warning and determining the validity of the driver's license and right to operate the vehicle, the officer

---

[27]*United States v. Williams*, 271 F.3d 1262, 1266 (10th Cir. 2001), *cert. denied*, 535 U.S. 1019 (2002); *United States v. Bustillos-Munoz*, 235 F.3d 505, 512 (10th Cir. 2000), *cert. denied*, 534 U.S. 854 (2001).

[28]*United States v. Cervine*, 347 F.3d 865, 870–71 (10th Cir. 2003) (internal quotation omitted); *United States v. Patten*, 183 F.3d 1190, 1193 (10th Cir. 1999).

[29]*United States v. Zubia-Melendez*, 263 F.3d 1155, 1161 (10th Cir. 2001); *see Illinois v. Caballes*, 543 U.S. 405, 407 (2005) ("[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission."); *United States v. Villa*, 589 F.3d 1334, 1339 (10th Cir. 2009).

usually must allow the driver to proceed without further delay.[30]

There is no evidence that the stop was prolonged beyond what was necessary to effectuate the purpose of the stop. Trooper Nicholas actually did not wait for the background checks to be completed before he returned defendants' documents, gave them a warning, explained the traffic infraction, told them to have a safe trip, said "thank you" and walked away from the vehicle. The period of detention was relatively brief and was not extended beyond what was necessary to effectual the purpose of the stop.[31]

### C. *Consent*

After the purpose of a traffic stop is complete, "further detention for purposes of questioning unrelated to the initial stop" is generally impermissible.[32] In general, prolonging the detention for further questioning beyond that related to the initial stop is permissible in two circumstances: (1) if the officer has an objectively reasonable and articulable suspicion illegal activity has occurred or is occurring; or (2) if the initial detention has become a consensual encounter.[33] The government does not contend that further detention was warranted based on reasonable suspicion; it argues that the stop was extended based on consent. Defendant argues that the consent was invalid because: (1) a reasonable person would not have felt free to leave when Trooper Nicholas turned back toward the vehicle and asked further questions; (2) Isaacson lacked authority to consent and Hunter did not indicate affirmative consent; and (3) the scope of

---

[30]*Patten*, 183 F.3d at 1193 (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)).

[31]Defendant appears to suggest that the scope was extended by the trooper's questions about whether there were illegal items in the car. But these questions occurred after the encounter became consensual, after Trooper Nicholas returned the documents, told defendants "thank you," and began to walk away.

[32]*United States v. Bradford*, 423 F.3d 1149, 1156-57 (10th Cir. 2005).

[33]*United States v. Hunnicutt*, 135 F.3d 1345, 1349 (10th Cir. 1998).

consent did not extend to the suitcase in the backseat of the vehicle.

### 1. Freedom to Leave

"A traffic stop may become a consensual encounter, requiring no reasonable suspicion, if the officer returns the license and registration and asks questions without further constraining the driver by an overbearing show of authority."[34] The Tenth Circuit follows a "bright-line rule that an encounter initiated by a traffic stop may not be deemed consensual unless the driver's documents have been returned."[35] The court has explained,

> The return of a driver's documentation is not, however, always sufficient to demonstrate that an encounter has become consensual. A routine traffic stop becomes a consensual encounter once the trooper has returned the driver's documentation so long as a reasonable person under the circumstances would believe [they] were free to leave or disregard the officers request for information.[36]

The Tenth Circuit has identified the following factors as relevant to determining the validity of a consensual encounter under the totality of the circumstances:

> [T]he threatening presence of several officers; the brandishing of a weapon by an officer; some physical touching by an officer; use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; prolonged retention of a person's personal effects such as identification and plane or bus tickets; a request to accompany the officer to the station; interaction in a nonpublic place or a small, enclosed place; and absence of other members of the public.[37]

---

[34]*United States v. West*, 219 F.3d 1171, 1176 (10th Cir. 2000).

[35]*Bradford*, 423 F.3d at 1158.

[36]*Id*. (internal quotations and citations omitted).

[37]*Ringold*, 335 F.3d at 1172 (citing *United States v. Hill*, 199 F.3d 1143, 1147-48 (10th Cir. 1999)).

Defendant first argues that the encounter did not become consensual because Trooper Nicholas never told defendants that they were free to leave. But it is axiomatic that an encounter does not become non-consensual merely because an officer fails to advise a driver that he was free to go.[38] Trooper Nicholas took several steps away from the vehicle after returning defendants' documents, then turned back around and asked Hunter if he could ask a few more questions. Hunter replied "yes." Only then did Trooper Nicholas ask defendants about the rental contract and whether there were illegal items in the vehicle. This procedure has been repeatedly approved by courts in this Circuit.[39] Defendant urges that the encounter was not consensual because Trooper Nicholas did not intend the seizure to end when he walked away from the vehicle. But this is not the appropriate standard; the standard is whether a reasonable person under the circumstances would believe they were free to leave. As described below, the Court finds that a reasonable person under these circumstances would believe they were free to decline Trooper Nicholas' request to ask more questions.

Moreover, the Court has reviewed the DVD of the traffic stop and has given weight to Trooper Nicholas' testimony that he did not display a coercive show of authority when he requested to ask defendants more questions. He testified that, although he was in uniform and armed, he had turned off his squad car lights, and he did not lean on the vehicle. The video further supports Trooper Nicholas' testimony that he did not make a coercive show of authority

---

[38]*See, e.g., United States v. Chavira*, 467 F.3d 1286, 1291 (10th Cir. 2006) (citing *Ohio v. Robinette*, 519 U.S. 33, 39-40 (1996)); *Bradford*, 423 F.3d at 1158.

[39]*See, e.g.*, *United States v. White*, 584 F.3d 935, 943 (10th Cir. 2009) (referring to "the old highway patrol 'two-step'"); *United States v. Barraza-Martinez*, Nos. 09-3048, 09-3057, 2010 WL 381618, at *5 (10th Cir. Feb. 4, 2010) (explaining that by asking if he could ask a few more questions, the deputy did not retract the defendant's freedom to leave).

such that a reasonable person would not have felt free to leave.[40] His tone was conversational an there is no other indication that Trooper Nicholas made a coercive show of authority.

Defendant argues that a reasonable person would not have felt free to leave because Trooper Nicholas implied that police action must be taken because the rental car contract had expired. He asked defendant if he was going to "take care" of the rental car situation and then explained that rental companies are picky about their cars being returned on time. Defendant points to Trooper Nicholas' testimony at the suppression hearing that he was suspicious about the fact that the rental car was overdue. But the Court agrees with the government that this is insufficient, standing alone, to conclude that the encounter was not consensual. As already stated, the Court finds that Trooper Nicholas did not maintain a coercive show of authority that would lead a reasonable person under the circumstances to believe that they were not free to leave. Trooper Nicholas' statements about the rental contract alone did not rise to the level of coercion that would create a non-consensual encounter.[41]

### 2. Authority to Consent

Defendant next argues that there was no valid consent because Isaacson did not have authority to consent to the search of the Dodge and Hunter did not expressly consent to the search.

Defendant first argues that Isaacson lacked authority to consent to the search because she

---

[40]*See United States v. Cardenas-Alatorre*, 485 F.3d 1111, 1118–19 (10th Cir. 2007).

[41]The Court notes that it is not bound by the Kansas Court of Appeals' finding in *Kansas v. Diaz-Ruiz*, that this trooper unlawfully extended the scope of a stop when his reasonable suspicion of a traffic violation evaporated before approaching the driver. 211 P.3d 836, 844 (Kan. Ct. App. 2009). Of course, the Court applies the law to the facts of this case only. Moreover, the basis for suppression in that case is unrelated to the issue of consent present in the instant case.

did not rent the vehicle; Hunter's name was the only name on the rental contract that Trooper Nicholas had reviewed at the beginning of the traffic stop. The government responds that Isaacson had actual authority to provide third-party consent to search or, alternatively, she had apparent authority to consent to the search. A third-party may have actual authority to consent "if that third party has either (1) mutual use of the property by virtue of joint access, or (2) control for most purposes."[42] Here, the evidence shows that Isaacson was the driver of the vehicle, both at the time of the initial stop, and at the time of consent. Trooper Nicholas asked both Isaacson and Hunter for consent to search and told them that if they agreed to let him search, they should hand him the keys. Isaacson and Hunter looked at one another prior to Isaacson handing Trooper Nicholas the keys and Hunter did not object. Under these circumstances, Isaacson had joint access to the vehicle and control for most purposes, as she was the driver. Defendant points the Court to no evidence that the name on the rental contract is determinative, when a third party has joint access and control of the vehicle.

Moreover, even if Isaacson lacked actual authority, she had apparent authority to consent. Apparent authority exists if "the facts available to the officers at the time they commenced the search would lead a reasonable officer to believe the third party had authority to consent to the search."[43] The test is whether the officer has a reasonable belief that the third party has either (1) mutual use of the property by virtue of joint access, or (2) control for most purposes."[44] Trooper Nicholas had a reasonable belief that Isaacson had authority to consent to the search for the same

---

[42] *United States v. Andrus*, 483 F.3d 711, 716 (10th Cir. 2007) (quotations omitted); *see also United States v. Matlock,* 415 U.S. 164, 171 (1974).

[43] *Andrus*, 483 F.3d at 716.

[44] *United States v. Cos*, 498 F.3d 1115, 1128 (10th Cir. 2007).

17

reasons she had actual authority to consent. Isaacson was driving the vehicle, and after Trooper Nicholas requested consent from them both, they looked at one another and Isaacson handed him the keys. The Court finds that under the totality of the circumstances, a reasonable officer would believe that Isaacson had authority to consent to the search.

Defendant argues that he did not consent to the search of the car and, since Isaacson lacked authority to consent, the consent was therefore invalid. Because the Court finds that Isaacson had both actual and apparent authority to consent, defendant's consent was unnecessary. Furthermore, there was no evidence that defendant objected or refused consent when Isaacson consented by handing Trooper Nicholas the keys.[45] Therefore, the Court finds that consent to search the vehicle was validly given by Isaacson.

### 3. Scope of Consent

"The scope of a search 'is generally defined by its expressed object,' and is 'limited by the breadth of the consent given.'"[46] The standard for measuring the scope of consent is "'objective reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect.'"[47] "The general rule is that 'when a suspect does not limit the scope of a search, and does not object when the search exceeds what he later claims

---

[45]*See Georgia v. Randolph*, 547 U.S. 103, 120 (2008) (holding that a warrantless search of a shared dwelling over the express refusal of consent by one physically present resident is not reasonable on the basis of consent given by another resident).

[46]*United States v. Elliott*, 107 F.3d 810, 814–15 (10th Cir. 1997) (quoting *Florida v. Jimeno*, 500 U.S. 248, 251 (1991); *United States v. McRae*, 81 F.3d 1528, 1537 (10th Cir. 1996) (further internal quotations omitted)); *see also United States v. Gregoire*, 425 F.3d 872, 880 (10th Cir. 2005).

[47]*Elliot*, 107 F.3d at 815 (quoting *Jimeno*, 500 U.S. at 251).

was a more limited consent, an officer is justified in searching the entire vehicle.'"[48]

Here, the Trooper asked if he could search the vehicle after he asked whether there was anything illegal in the vehicle. Isaacson provided consent when she handed Trooper Nicholas the keys of the vehicle, as he had instructed her to do if she consented to the search. Hunter provided no response. Neither defendant placed a limitation on the scope of consent. The Court finds that it would have been clear to a reasonable person that the object of the search at issue was illegal contraband. Furthermore, the Court concludes that the consent included consent to search the containers found in the vehicle. Since "[o]ne in possession of illegal narcotics does not typically leave them out in the open [, c]onsent to an officer's request to search for drugs would reasonably include areas in which one would be expected to hide drugs."[49] There is no requirement that the police must separately request permission to search each closed container in a vehicle.[50] Trooper Nicholas told the occupants that he detected an odor of marijuana when he approached the suitcase in the backseat of the vehicle just prior to opening the suitcase. A reasonable person advised of a strong suspicion that there are drugs in a container could expect a more invasive search to ascertain the contents of the container.[51] Accordingly, the Court finds that the scope of consent extended to the suitcase in the backseat of the vehicle.

**IT IS THEREFORE ORDERED BY THE COURT** that defendant Damon Hunter's Motion to Suppress (Doc. 26) is **denied**.

---

[48]*United States v. Contreras*, 506 F.3d 1031, 1037 (10th Cir. 2007) (quoting *United States v. West*, 219 F.3d 1171, 1177 (10th Cir. 2000)).

[49]*United States v. Pena*, 143 F.3d 1363, 1368 (10th Cir. 1998).

[50]*Jimeno*, 500 U.S. at 251–52.

[51]*See Gregoire*, 425 F.3d at 880–81.

**IT IS SO ORDERED**.

Dated: April 30, 2010

                                             S/ Julie A. Robinson
                                             JULIE A. ROBINSON
                                             UNITED STATES DISTRICT JUDGE